UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PHILLIP A . BADALAMENT,

                    Plaintiff,                        No. 05-CV-74932-DT

vs.                                       Hon. Gerald E. Rosen

UNITED OF OMAHA LIFE INSURANCE
COMPANY, a life and health insurer,
KEY AUTOMOTIVE GROUP, designated
Plan Administrator, and KEY SAFETY
SYSTEMS, INC., a Delaware corporation,

                    Defendants.

_____/

OPINION AND ORDER GRANTING DEFENDANTS'
MOTIONS FOR ENTRY OF JUDGMENT AND DENYING PLAINTIFF'S
MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____ September 23, 2009 _____

PRESENT:  Honorable Gerald E. Rosen
                          Chief Judge, United States District Court

I.  INTRODUCTION

This ERISA denial of benefits action is presently before the Court on  the Motions

for Entry of Judgment filed by Defendants Key Automotive Group and Key Safety

Systems, Inc. (collectively "Key") and United of Omaha Life Insurance Company

("United"), the insurer and administrator of the accidental death, dismemberment and life

insurance component of Key's employee welfare benefit plan, and the Motion for

1

Judgment on the Administrative Record filed by Plaintiff Phillip K. Badalament.  Having
reviewed Plaintiff's and Defendants' briefs, and the Administrative Record of this matter,
the Court has determined that oral argument is not necessary.  Therefore, pursuant to
Local Rule 7.1(e)(2), this matter will be decided on the briefs.  This Opinion sets forth the
Court's ruling.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

This ERISA action concerns a claim for benefits under two Mutual of Omaha life
insurance policies insuring the life of Paul Badalament who died on September 8, 2005.
Prior to his death, Mr. Badalament was employed as a commodity manager by Defendant
Key Safety Systems, Inc., an affiliate of Defendant Key Automotive Group,  from June 1,
1995 through March 18, 2005, when his employment was terminated due to a reduction-
in-force.

During the course of his employment, Paul Badalament was a participant in an
employee benefit plan (the "Plan") sponsored by his employer which offered accidental
death, dismemberment and life insurance coverage to plan participants.  Pursuant to the
Plan documents, Key Automotive Group was designated as the Plan Administrator which,
in turn, delegated to Defendant United the discretionary and final authority to construe
and interpret the Plan provisions and to decide all questions of eligibility and the amount
and payment of any benefits.  Mr. Badalament elected to receive life insurance coverage
under two Mutual of Omaha group life insurance policies in the face amounts of
$139,000 and $209,000, and designated his brother, Plaintiff Phillip Badalament, as

2

beneficiary.

On March 21, 2005, in connection with the termination of his employment, Paul Badalament and Key entered into a Settlement Agreement, Waiver and General Release (the "Settlement Agreement"), pursuant to which Key provided Mr. Badalament an "enhanced severance" package consisting of a 20-week continuation of his salary and medical benefits. Prior to entering into this Agreement, Richard Blough, Key's Senior Vice President for Human Resources and Communication advised Mr. Badalament to "seek independent legal counsel" to advise him on the matter.  *See* Administrative Record p. 439-440.  He was also given 21 days within which to consider the Settlement Agreement, *id*., and further informed that, if he decided to accept the severance offer and executed the Agreement, he would have seven days after acceptance to change his mind and revoke his acceptance.  *Id.*

In pertinent part, the Settlement Agreement provided as follows:

Employee [Paul L. Badalament] and the Company [Key Safety Systems, Inc.] desire to settle, in good faith, fully and finally any and all differences between them that may exist in connection with the termination of the employment of Employee by the Company.

Company, in exchange for Employee's covenants as set forth herein, wishes to pay an enhanced severance benefit to Employee in addition to the regular severance benefit of ten (10) weeks of salary and medical benefits continuation to which Employee is already entitled under the Company's Severance Program for Salaried Exempt and Salaried Non-Exempt Personnel dated August 12, 2002.

AGREEMENT

In consideration of the premises and mutual promises herein

3

contained, it is agreed as follows:

FIRST:  The Company agrees that when the Company receives the fully executed original of this Settlement Agreement, Waiver and General Release, the Company will (a) pay and cause to be delivered to Employee as a series of checks representing an enhanced severance benefit on each succeeding regular, semi monthly payroll date for the ten (10) week period following expiration of the normal severance period (i.e., ten weeks following termination of employment), each in the gross amount of Two thousand eight hundred ninety and 00/100 dollars ($2,890.00), or a pro-rata portion thereof for partial weeks, less applicable federal, state and local deductions, and (b) continue coverage of Employee under the Company provided health benefit plans (medical, prescription drug, dental and vision care) for the same additional ten (1) week period on the same basis as now provided. . . .  During this period, Employee will not be expected to work or to report for work except as to those matters where a specific transaction or circumstance requires Employee to be or to become involved.

SECOND:  This Settlement Agreement, Waiver and General Release is not and shall not in any way be construed as an admission by the Company. . . that Employee's termination was unwarranted, unjustified, discriminatory or otherwise wrongful or unlawful, but constitutes the good faith settlement of a disputed claim. . . .  The parties have entered into this Settlement Agreement, Waiver and General Release for the sole purpose of resolving the disputed claim, and to avid the burden, expense, delay and uncertainties of litigation.

THIRD:  Employee agrees and recognizes that his employment relationship with the Company and its parents, affiliates and successors has been permanently and irrevocably severed on the effective date of this Agreement. . . .

FOURTH:  In consideration of the enhanced severance payments and benefits to be made by the Company to Employee or for the benefit of Employee set forth in Paragraph FIRST above, Employee hereby irrevocably and unconditionally waives and releases, remises, and forever discharges the Company and each of the Company's owners, stockholders, agents, directors, officers, employees, representatives, attorneys, divisions, subsidiaries, affiliates (and agents, director, officers, employees, representatives and attorneys of such divisions, subsidiaries and affiliates), and its and their predecessors, successors, heirs, executors, administrators,

4

and assigns, and all persons acting by, through, under or in concert with any of them (collectively "Releasees"), or any of them, of and from any and all actions, causes of action, suits, debts, charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever, in law or equity, which he ever had, now has, or he or his heirs, executors and administrators hereafter may have, particularly, against each of or any of the Releasees. . . by reason of any claims against the Company arising from or related to any. . . employee benefit plan of the Company Employee's employment relationship with the Company or the termination thereof, including any claims arising from any alleged violation by the Company of  . . . any federal, state or local statutes, ordinances or common laws, including, but not limited to the. . . Employees Retirement Income Security Act of 1974, as amended. . . .  The foregoing waiver and release extends to and includes any and all claims which Employee made or could have made for. . . damages. . . , but does not extend to or include any rights or claims that Employee may subsequently have and which arise based upon acts, transactions or events which occur after the date of the execution by Employee of this Settlement Agreement, Waiver, and General Release.

* * *

SIXTH:  Employee acknowledges and agrees that the payments to be made to him and for his benefit by the Company pursuant to Paragraph FIRST above are not payments to which Employee is otherwise already entitled and, accordingly, such payments provide to Employee full, complete and adequate consideration and compensation for the waiver and release of all rights and claims made and given by Employee in this Settlement Agreement, Waiver and General Release.

* * *

NINTH:  Employee represents and certifies that he has carefully read and fully understands all of the provisions and effects of this Settlement Agreement, Waiver and General Release, and has thoroughly discussed all aspects of this Settlement Agreement, Waive and General Release with Employee's private attorney (or has been advised by the Company to do so), that Employee is voluntarily entering into this Settlement Agreement, Waiver and General Release, that he was given at least 21 days to consider it prior to signing it, and that neither the Company nor its agents,

5

representatives or attorneys, made any representations concerning the terms or effects of this Settlement Agreement, Waiver and General Release other than those contained herein.

* * *

SEVENTEENTH:  This Settlement Agreement, Waiver and General Release sets forth the entire agreement by the parties hereto, and fully supersedes any and all prior agreements or understandings between the parties hereto pertaining to the subject matter hereof.

[A.R. 441-444, Plaintiff's Ex. 6.]

As noted, Paul Badalament died on September 8, 2005.  The death certificate indicated the cause of death as "multiple organ failure secondary to multiple myeloma." [A.R. 145.] Shortly thereafter, on or about September 13, 2005, Plaintiff Phillip Badalament contacted Key Automotive Group to file a claim, as beneficiary, for his brother's $348,000 life insurance benefits.

Plaintiff claims that in late September or early October 2005, he was notified by phone that his Claim "was being denied," but that he was given no explanation for the denial.  *See* Complaint, ¶ 32.  Though Defendants admitted that their representatives had oral communications with Plaintiff during September and October 2005, they denied having ever informed Plaintiff that his Claim was "denied."  [*See* Defendants' Answer, ¶ 32.]

In any event, on October 20, 2005, Plaintiff filed a putative "appeal" of the alleged oral denial of his Claim.  When more than 45-days thereafter elapsed without a decision on his "appeal," on December 30, 2005, Plaintiff filed the instant action claiming that

6

because Defendants never provided him with a decision on his appeal it must be deemed allowed and admitted and not denied.  *See* Complaint, ¶ 41.  Defendants countered that Plaintiff's October 20, 2005 correspondence did not and could not constitute an "appeal" because there was never any consideration of Plaintiff's claim by United of Omaha -- which, as indicated, under the Plan Documents, has the exclusive and final authority to make claim determinations -- since it never received Plaintiff's claim.  *See* Defendants' Answer to Complaint, ¶¶ 32-34.  United of Omaha stated that it did not receive Plaintiff's claim until January 10, 2006 when it was served with a copy of Plaintiff's Complaint in this action, which had a copy of the claim appended to it as an exhibit.

After receiving this Court's Notice of a Scheduling Conference, Plaintiff filed a Motion for Partial Summary Judgment asking the Court for a declaratory judgment declaring that by failing to timely respond to his Claim or provide him with the reasons for its purported denial of the Claim within the time limits provided in the Plan Documents, United of Omaha has waived its right to assert any basis for any denial of the Claim, and therefore, United is obligated to pay Plaintiff's Claim under the life insurance policies.  Defendants, meanwhile, cross-moved to dismiss Plaintiff's Complaint, without prejudice, or in the alternative to stay proceedings pending Plaintiff's exhaustion of administrative remedies.

On March 30, 2007, the Court entered an Opinion and Order denying Plaintiff's Motion, dismissed Plaintiff's Complaint, without prejudice, and remanded the case to the Plan Administrator for exhaustion of administrative remedies.  *See Badalament v. United*

7

*of Omaha Life Ins. Co.*, 2007 WL 1006908 (E.D. Mich. 2007).  The Judgment of

dismissal provided that Plaintiff could move to re-open the case after he fully exhausted

his administrative remedies.  *See* Dkt. # 14.

Pursuant to this Court's Order, Plaintiff proceeded with his claim administratively.

The Plan Administrator denied Plaintiff's claim on December 17, 2007.  *See* A.R. 149-

151, Plaintiff's Ex. 9.  In its letter informing Plaintiff of the denial of his claim, the Plan

Administrator explained to Plaintiff that his brother was not covered by any life insurance

policy at the time of his death; that his brother's coverage under the Key life insurance

program ended on March 31, 2005, the last day of the month in which he was no longer

actively employed.[1]

---

[1]  The life insurance policy defines "Actively Employed" as "Actively Working on
a regular and consistent basis for the Policyholder 20 or more hours each week," and
states that "Actively Working" means performing the normal duties of a regular job for
the Policyholder at the Policyholder''s usual place of business, an alternative worksite at
the direction of the Policyholder or a location to which one must travel to perform the job.
A.R. 018.

> The policy also states that insurance will end at midnight at the main office
> of the Policyholder on the earliest of:
> > (a)  the day this Policy ends;
> > (b)  the day any premium contribution for Your insurance is
> > due and unpaid;
> > (c)  the day before You enter the Armed Forces on active duty
> > (except for active duty of two weeks or less): or
> > **(d)  the last day of the policy month in which You are no
> > longer eligible.**
>
> **You will no longer be eligible when the earliest of the
> following occurs:**
> > (1)  the day You are not in eligible classification

The Plan Administrator noted, however, that the policy also contains a provision allowing coverage to continue if a terminated employee is totally disabled at the time employment terminates and continues to be totally disabled at and through the date coverage would otherwise end.[2]  Therefore, although Plaintiff made no claim of disability, the administrator obtained the decedent's medical records and referred them to United's Medical Director for review.  Based on that review, however, United determined that Paul Badalament was not totally disabled at the time he stopped working or at the time coverage ended on March 31, 2005.  The administrator concluded that any total disability experienced by Mr. Badalament did not occur until shortly before his death on September 8, 2005, months after coverage ended.  A.R. 150.  Therefore, United denied

---

described in the Schedule;
**(2)  the day Your employment with the Policyholder ends;**
**(3)  the day You are not actively employed;** or
(4)  the day You do not satisfy any other eligibility condition described in the Policy.

A.R. 020.

[2]  "Totally Disabled" under the policy means that "because of an injury or sickness you are completely and continuously unable to perform any work or engage in any occupation."  *See* A.R. 017.  The policy provides,

If you are Totally Disabled, your Life Insurance Benefits will not end in accordance with the **When Your Insurance Ends** provision, but will be continued without payment of premium provided. . . the Total Disability began while you were insured under this Policy.

A.R. 021.

9

Plaintiff's claim.

Plaintiff subsequently administratively appealed the denial of his claim, and on July 11, 2008, the appellate review confirmed that Plaintiff's claim for insurance benefits was properly denied. *See* Plaintiff's Ex. 9. In reaching this conclusion, United specifically addressed Plaintiff's claim that his brother was entitled to continuation of coverage because Key had deducted premium payments from his severance checks,[3] and explained that notwithstanding this administrative error, Mr. Badalament was no longer actively employment and hence, not eligible for coverage as of March 31, 2005. A.R. 089.

The Plan Administrator also rejected Plaintiff's argument that the Settlement Agreement his brother had signed was an "active employment agreement." The administrator explained, "[T]he severance payments do not equate to hours worked as he was not actively working or actively employed [during the severance period] as defined by the policies." A.R. 090.

Plaintiff having exhausted his administrative remedies with the conclusion of the appeal, on September 24, 2008, the parties stipulated to re-open this action. The matter is now before the Court on Defendants' motions for entry of judgment and Plaintiff's cross-

---

[3] The Court addressed the premium deductions in its March 30, 2007 Opinion and Order. As previously explained, due to a change in the company's payroll system, Key mistakenly continued to deduct life insurance premiums from Mr. Badalament's severance checks during the 20-week post-termination severance period but did not discover this error until the health coverage deductions ended with the expiration of the 20-week period in August 2005. The sums deducted are being refunded.

10

motion for judgment on the administrative record.

DISCUSSION

A.    STANDARD OF REVIEW

The Sixth Circuit has held it improper to resolve actions for wrongful denial of

benefits under ERISA on motions for summary judgment. *Wilkins v. Baptist Healthcare

Sys., Inc.*, 150 F.3d 609, 619 (6th Cir.1998). Under *Wilkins*, the Court must conduct a *de

novo* review of the administrative record unless the plan gives the plan administrator

discretion to determine eligibility or to construe the plan's terms.  *Id.*  If the administrator

is granted discretion, an arbitrary and capricious standard applies.  *Firestone Tire &

Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956-57 (1989).

The procedure for obtaining such review in an ordinary denial of benefits case

under ERISA, post-*Wilkins*, is by motion for judgment on the administrative record.  This

case, however, distinguishes itself from the ordinary wrongful denial of benefits case in

that Defendant Key interposes the Settlement Agreement executed by Paul Badalament as

a complete defense to Plaintiff's claims.  Review of the administrative record is not

necessary to decide the merits of Key's defense.  The Settlement Agreement is a contract.

In contract actions, summary judgment may be appropriate.  *Manley v. Plasti-Line, Inc.*,

808 F.2d 468, 471 (6th Cir.1987) (citation omitted); *see also Sullivan v. Cap, Gemini,

Ernst & Young U.S.*,  518 F. Supp. 983 (N.D. Ohio 2007) ("*Sullivan I*") (applying

summary judgment standard in deciding defendant's motion for entry of judgment in

ERISA action based on plaintiff's contractual waiver of claims).  Summary judgment is

11

proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

B.     PLAINTIFF'S CLAIMS AGAINST KEY HAVE BEEN WAIVED AND
       RELEASED

As discussed above, upon the termination of his employment, Paul Badalament executed a Settlement Agreement, General Release and Waiver pursuant to which he received from Key ten weeks of additional severance pay and payment of medical benefits in exchange for his execution of a waiver and general release of claims.  The Agreement was executed by Mr. Badalament approximately one month after his last day of employment with Key and releases all claims that Mr. Badalament and his "heirs, executors and administrators" might have against Key, its "agents, . . . affiliates . . . and all persons acting in concert with any of them."  *See* A.R. 442.  Pursuant to the Agreement, Mr. Badalament expressly waived and released any claims under the Employee Retirement Income Security Act and any other claims he may have had in connection with the termination of his employment and Key's employee benefit plans. A.R. 442.  This release further extended to claims of which Mr. Badalament knew or did not know at the time he executed the Agreement.  A.R. 443, 444.

The Sixth Circuit has repeatedly upheld dismissals of ERISA causes of action based upon the plaintiffs' execution of valid waiver and release agreements in connection with the termination of their employment.  *See e.g., Taylor v. Visteon Corp.*, 149 Fed.

12

Appx. 422 (6th Cir. 2005) (ERISA claims waived by release agreement given in exchange for enhanced severance package); *Halvorson v. Boy Scouts of America*, 215 F.3d 1326, 2000 WL 571933 (6th Cir. 2000) (Table) (ADA, FMLA and ERISA claims waived); *Samms v. Quanex*, 99 F.3d 1139, 1996 WL 599821 (6th Cir. 1996) (Table) (ERISA and state law claims waived). *See also*, *Sako v. Ohio Dept. of Admin. Serv.*, 278 Fed. Appx. 514 (6th Cir. 2008) (Title VII claims waived). Federal common law controls the validity of a release of a federal cause of action. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1481 (6th Cir.1989); *Nicklin v. Henderson*, 352 F.3d 1077, 1080 (6th Cir. 2003), *cert. denied,* 541 U.S. 1031 (2004). Such waivers are enforceable provided that they are knowing and voluntary. *Id*.

The Sixth Circuit has considered the following factors in determining whether waivers of employment discrimination claims are knowing and voluntary: (1) the employee's experience, background and education; (2) the amount of time the employee had to consider the release, including whether he had the opportunity to consult with an attorney; (3) the clarity of the release; (4) the consideration for the release; and (5) the totality of the circumstances. *Nicklin, supra*; *Sako, supra*, 278 Fed. Appx. at 518 (quoting *Adams v. Philip Morris, Inc.*, 67 F.3d 580, 586 (6th Cir. 1995)). These same factors have been used by the courts in evaluating waivers of ERISA claims. *See, e.g. Frommert v. Conkright*, 535 F.3d, 111, 121 (2nd Cir. 2008); *Morais v. Central Beverage Corp. Union Supplemental Retirement Plan*, 167 F.3d 709, 713 n.6 (1st Cir. 1999); *Leavitt v. Northwestern Bell Telephone Co.*, 921 F.2d 160, 162 (8th Cir. 1990); *Smart v. Gillette*

13

*Co. Long-Term Disability Plan*, 70 F.3d 173, 181 n.3 (1st Cir. 1995); *Sullivan v. Cap Gemini Ernst & Young U.S.*, 518 F. Supp. 2d 983, 994 (N.D. Ohio 2007) ("*Sullivan I*"); *Homenick v. National Steel Corp.*, 1996 WL 426549 (E.D. Mich. 1996).

The Court finds these factors satisfied in this case. As reflected in the Administrative Record, Paul Badalament was an educated, experienced businessman. He possessed a bachelor's degree and was last employed as a commodity manager earning approximately $70,000 per year. [A.R. 454, 457]. He was given 21 days to consider the Agreement and did not execute it for at least the full 21-day period. [A.R. 439-444]. Mr. Badalament was specifically advised to consult an attorney concerning the Agreement before signing it. [A.R. 439]. The Agreement specified that ERISA claims were among the claims waived by the Agreement, and that the waiver extended to any claim he ever had as well as any such claim that he or *his heirs, executors and administrators hereafter may have*. [A.R. 442.] The Agreement specifically informed Mr. Badalament, in capital letters above the signature block that the Agreement "INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS." [A.R. 444.] He received valuable consideration for his release of the claims, i.e., an enhanced severance package consisting of ten additional weeks of salary and paid medical benefits. [A.R. 441].

Courts have repeatedly found former employees' waivers of ERISA claims valid under similar circumstances. For example, in *Parisi v. Kaiser Corp.*, 2008 WL 220101 (N.D. Cal. 2008), the court granted summary judgment for the defendant finding that the plaintiff's waiver of ERISA benefits executed as part of a severance agreement when his

14

employment was terminated due to a reduction-in-force was knowing and voluntary where the plaintiff had a college degree and 15 years experience as a manager;  was given upon to 21 days to consider its terms and seven days to revoke the agreement after its signing; was advised to consult with an attorney before signing it; and was given a severance package valued in the six-figure range.  *See id.* at *4.

Similarly, in *Homenick v. National Steel Corp., supra*, Judge Zatkoff found the plaintiff's waiver of his ERISA rights to be voluntary and valid based on evidence showing that the plaintiff, who had a bachelor of engineering degree and over thirty years experience as a facility engineer, was given 45 days in which to consult an attorney before signing his severance agreement; utilized 21 days before signing; and received substantial consideration (a lump sum equivalent to one year's salary) for signing the agreement.  *Homenick*, 1996 WL 426549 at *2.. *See also Sullivan I, supra*, 518 F. Supp. 2d at 994 (summary judgment entered in favor of employer on plaintiff's ERISA claim based on her execution of a release upon termination of her employment in connection with a RIF where the plaintiff, a well educated, sophisticated businessperson, was given 45 days to consider the release, counseled to consult an attorney before signing, and received a cash payment of $20,000 (the equivalent of one-month's salary) in exchange for her signing.)

Under these circumstances, the Court concludes that Plaintiff's claims against Defendant were validly and voluntarily waived by his brother when he executed the Settlement Agreement, General Release and Waiver upon the termination of his

15

employment.  Therefore, the Court will grant summary judgment in favor of Defendant

Key and Plaintiff's claims against Key Automotive Group and Key Safety Systems, Inc.

will be dismissed.[4]

C.      THE ADMINISTRATIVE RECORD SUPPORTS A REASONED
        EXPLANATION FOR UNITED'S DECISION TO DENY PLAINTIFF'S CLAIM

        As indicated above, the Supreme Court has ruled that the standard of review in

ERISA cases is *de novo* unless the benefit plan gives the plan administrator discretion to

determine eligibility for benefits or construe plan terms:

> Consistent with established principles of trust law, we hold that a denial of
> benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo*
> standard unless the benefit plan gives the administrator or fiduciary
> discretionary authority to determine eligibility for benefits or to construe the

---

[4]  The waiver and release provisions of the Settlement Agreement, General Release
and Waiver extended not only to Mr. Badalament's employer, Defendant Key, but also to
Key's agents and all persons acting on Key's behalf.  *See* A.R. 442 ("Employee hereby
irrevocably and unconditionally waives, and releases, remises, and forever discharges the
Company and each of the Company's owners, stockholders, *agents*, directors, officers,
employees, *representatives*, divisions, subsidiaries, affiliates. . . and *all persons acting by
or through, under or in concert* with any of them. . . .")  Thus, arguably Plaintiff's claims
against Defendant United, which acted on Defendant Key's behalf with respect to
administration of the life insurance component of Key's employee benefit plan, are also
barred by the Settlement Agreement.  *See e.g., Homenick v. National Steel Corp., supra*,
1996 WL 426549 at *3 (holding that release in plaintiff's severance agreement barred
plaintiff's ERISA claims not only against his employer but also against his employer's
LTD plan and the plan's fiduciaries); *see also Sullivan v. Cap Gemini Ernst & Young
U.S.*, 573 F. Supp. 2d 1009, 1017-1022 (N.D. Ohio 2008) ("*Sullivan II*") (waiver barred
plaintiff's claims against her employer and her employer's employee benefit plan.)
United, however, did not join in Key's motion for summary judgment and has made no
argument that Plaintiff's claim under his brother life insurance policy is barred.  Instead,
it filed only its own motion for entry of judgment arguing only for a finding that it offered
a reasoned basis for its denial based upon its administrative review of Plaintiff's claim for
benefits.

16

terms of the plan.

*Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956 (1989).

*See also, Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 616 (6th Cir. 1998).

However, "where an ERISA plan expressly affords discretion to trustees to make benefit

determinations, a court reviewing the plan administrator's actions should apply the

arbitrary and capricious standard of review." *Williams v. International Paper Co.,* 227

F.3d 706, 711 (6th Cir. 2000).  Whether a plan provides its administrator or trustees with

discretionary authority, however, does not depend upon the use of any specific

terminology or "magic words," (such as "construe," "interpret," "deference," or

"discretion"), but the plan must contain "a clear grant of discretion." *Perez v. Aetna Life*

*Ins. Co*., 150 F.3d 550, 555 (6 th Cir.1998) *(en banc)*.

> Here, it is expressly stated in Key's life insurance plan, that
>
> the Policyholder [Key] grants United of Omaha Life Insurance Company the discretion and final authority to construe and interpret the policy.  This means that United has the authority to decide all questions of eligibility and all questions regarding the amount and payment of any policy benefits within the terms of the policy as interpreted by United.

A.R. 006.

Therefore, the arbitrary and capricious standard governs this Court's review of

United's decision.

The arbitrary and capricious standard is a highly deferential one.  *See Killian v.*

*Healthsource Provident Adm'rs, Inc*., 152 F.3d 514, 520 (6th Cir.1998) (quoting *Yeager*

*v. Reliance Standard Life Ins. Co*., 88 F.3d 376, 380 (6th Cir.1996)) ("where, as here, the

17

plan administrator is given the discretionary authority to determine eligibility for benefits or to construe the plan terms, 'we review the administrator's decision to deny benefits using 'the highly deferential arbitrary and capricious standard of review.'")  Under the arbitrary and capricious standard, a court will uphold a plan administrator's benefit determination if that determination was rational in light of the plan's provisions.  *Daniel v. Eaton Corp*., 839 F.2d 263, 267 (6th Cir. 1987), *cert. denied*, 488 U.S. 826 (1988).  *See also*, *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989), *cert. denied*, 495 U.S. 905 (1990) ("[W]hen it is possible to offer a reasoned explanation, based on evidence for a particular outcome, the outcome is not arbitrary and capricious.")  Although review pursuant to the arbitrary-or-capricious standard is thus extremely deferential, it "is not no review, and deference need not be abject." *McDonald v. Western-Southern Life Ins. Co*., 347 F.3d 161, 172 (6th Cir.2003) (citations and internal quotation marks omitted).  Application of the standard includes "some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Id.*  Under this standard, review is confined to the administrative record as it existed at the time the plan administrator made its final decision.  *Moon v. Unum Provident Corp*, 405 F.3d  373, 378-79 (6th Cir. 2005).

Here, the administrative record supports a reasoned explanation for United's denial of Plaintiff's claim and demonstrates that United did not act arbitrarily and capriciously in reaching that conclusion.

As indicated above, the plain language of the plan establishes that Paul

18

Badalament was not covered by or eligible for coverage under the Key life insurance plan at the time of his death.  The life insurance policy expressly states that the insured's coverage under the policy ends "the last day of the month You are no longer eligible," and that an employee is no longer eligible "the day Your employment with the Policy holder ends" or "the day You are no longer actively employed," whichever is earlier. [A.R. 020] Mr. Badalament last was actively employed on March 18, 2005, as his employment with Key ended on that date.  Pursuant to the express terms of the policy, therefore, his life insurance benefits ended on March 31, 2005.  Although there was a 31-day conversion period under the policy which began on the day coverage ended which would have allowed Paul Badalament to apply for an individual life insurance policy without evidence of good health, *see* A.R. 031, Mr. Badalament never applied for a conversion policy.

Although Plaintiff never claimed that his brother was disabled when his employment with Key was terminated, United nonetheless also evaluated Plaintiff's claim under the policy provision that allows coverage to continue after termination of employment if the terminated employee is totally disabled at the time his employment terminates and he continues to be totally disabled thereafter.  *See* A.R. 020-022.  As indicated, "total disability" is defined in the policy being "completely and continuously unable to perform any work or engage in any occupation."  A.R. 017.  Though Plaintiff never made any claim of disability, United obtained records from Mr. Badalament's treating physicians, Dr. Arturo Prada, M.D., a nephrologist;  Sumner Camisa, M.D., a

19

cardiologist; Dr. Tariq Abbasi, M.D., a psychiatrist;  Phyllis Mazure, M.A., a counselor; Dr. Homaira Danish, M.D., an otlarygologist; and William Beaumont Hospital, *see* A.R. 154-316, and had them reviewed by its Medical Director, Dr. Timothy Tse, M.D., to advise United whether the medical records would establish that Mr. Badalament was totally disabled at any time prior to his death on September 8, 2005 and, if so, when the disability began and ended.  A.R. 154.

The medical records produced by Mr. Badalament's treating physicians show that, before his employment was terminated, he began seeing Dr. Tariq Abbasi and Phyllis Mazure for psychological/psychiatric treatment.  A.R. 161-221.  He complained of depression and anxiety due to work circumstances.  *Id.*  However, he only saw these psychological/psychiatric providers five times, and by March 8, 2005, he advised the doctors that he was less depressed and less anxious. *Id.*  Neither Dr. Abbasi nor Ms. Mazure noted any severe cognitive impairment, and their records indicate that they were pleased with the progress Mr. Badalament had made in the short time they treated him. *Id.*

During this same period of time, Mr. Badalament treated with Dr. Sumner Camisa complaining of dizziness, headaches and nausea.[5]  *See* A.R. 180-83.  However, he told the doctor that he had not had any previous such symptoms and the doctor noted that he was not in any acute distress.  *Id.*  Dr. Camisa diagnosed his patient's problem as stress.  *Id.*

---

[5]  Dr. Camisa was Mr. Badalament's primary care physician.  *See* A.R. 241.

20

When Mr. Badalament saw Dr. Camisa again in March, Dr. Camisa noted that he was much improved -- that he had started wearing glasses in response to blurry vision, that he was sleeping seven hours without the need for medication, that his headaches had improved, and that he was treating for depression.  *Id.*  When he subsequently saw Dr. Camisa later in the summer of 2005, he told Dr. Camisa that he was "looking for a job."  A.R. 264.

Dr. Camisa's associate, Dr. Rehrer, saw Mr. Badalament in June 2005 and noted that his patient's then recently diagnosed hypertension was "now controlled by Lotrel" and he observed that Mr. Badalament "feels appreciatively better, including more energy and marked less shortness of breath." A.R. 285.

In August 2005, Mr. Badalament was treated by Dr. Arturo Prada, a nephrologist, for gastrointestinal and abodominal pain.  Dr. Prada diagnosed Mr. Badalament with polycystic kidney disease.  A.R. 242-43.  That same month, Dr. Homaira Danish treated him for dry mouth, diagnosing him with a disturbancy of salivary secretion.  A.R. 278-80.  In neither instance did Dr. Prada or Dr. Danish express any concern and merely scheduled return visits within two months.  *Id.*  Indeed, Dr. Danish noted on August 5, 2005, one month prior to Mr. Badalament's death, that Mr. Badalament had "normal activity, normal energy level, [and] no change in weight." A.R. 279-80.

In sum, none of Paul Badalament's treating physicians expressed any view that Mr. Badalament was disabled at any time between February and August 2005, nor do the medical records support any such finding.  Rather, the medical records show, as Plaintiff

himself concedes, that Mr. Badalament's various medical issues prior to nearly the end of his life were "innocuous and unrelated."

Based upon the Court's review of the above cited medical records and the Administrative Record, as a whole, the Court finds that Dr. Tse's conclusion that Paul Badalament was not "totally disabled" as defined within the policy until shortly before his death, when, on August 24, 2005, he suffered renal failure was neither arbitrary nor capricious. Therefore, United did not abuse its discretion when, based upon Dr. Tse's evaluation of the medical records, it determined that Mr. Badalament was not totally disabled when his employment with Key was terminated and, thus, did not fall within the "continuing total disability" policy provision that would have allowed his life insurance coverage to continue after the termination of his employment.

The Supreme Court has also instructed that lower courts are to consider any conflict of interest that arises out of a plan administrator's dual role of both evaluating and paying benefits claims in determining whether there is an abuse of discretion. *See Metropolitan Life Ins. Co. v. Glenn*, ___ U.S. ___, 128 S.Ct. 2343 (2008). *See also Firestone, supra* 489 U.S. at 115. However, the Court has declined to delineate how such a conflict of interest should be taken into account on judicial review of a discretionary benefit determination:

> [W]e do [not] believe it necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict. In principle, as we have said, conflicts are but one factor among many that a reviewing judge must take into account. Benefits decisions arise in too many contexts,

22

concern too many circumstances, and can relate in too may different ways
to conflicts -- which themselves vary in kind and in degree of seriousness --
for us to come up with a one-size-fits-all procedural system that is likely to
promote fair and accurate review. . . .

We believe that *Firestone* means what the word "factor" implies,
namely, that when judges review the lawfulness of benefit denials, they will
often take into account of several different considerations of which a
conflict of interest is one. . . .  Any one factor will act as a tiebreaker when
the other factors are closely balanced, the degree of closeness necessary
depending upon the tie breaking factor's inherent or case specific
importance.

*Glenn*, 128 S.Ct. at 2351.

Consideration of the conflict of interest factor in this case does not alter the

Court's conclusion.  Indeed, the Administrative Record establishes that United went

above and beyond what it was required to do in evaluating whether there was any basis to

grant Plaintiff's claim for benefits.  As indicated, the plain language of the policy

precluded Plaintiff's claim as his brother's coverage under the policy ended when his

active employment with Key ended in March 2005.  Although Plaintiff never contended

that his brother was entitled to coverage under the "continuing disability" provision when

he submitted his claim for benefits, United, nonetheless, evaluated his claim under this

provision, as well.  It asked Plaintiff to identify all of his brother's treating physicians and

obtained records from all of them to see if the records would support a finding that Paul

Badalament was disabled in March 2005 when his employment was terminated and, if so,

whether such a disability continued thereafter.  Unfortunately for Plaintiff, none of the

records support a "total disability" finding, as that term is defined in the policy.

23

<u>CONCLUSION</u>

For all of the reasons set forth above in this Opinion and Order, the Court concludes that judgment should be entered in favor of Defendants and against Plaintiff. Therefore,

IT IS HEREBY ORDERED that Defendant Key Automotive Group and Key Safety Systems' Motion for Judgment **[Dkt. # 22]** and Defendant United of Omaha's Motion for Entry of Judgment **[Dkt. # 23]** are GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Judgment on the Administrative Record **[Dkt. # 21]** is DENIED.

Let Judgment be entered accordingly.


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  September 23, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 23, 2009, by electronic and/or ordinary mail.

s/Ruth Brissaud
Case Manager

24